UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

------------------------------------------------------

                                      :

UNITED STATES                  :          CASE NO. 1:07-cr-00566

                                      :

             Plaintiff,         :

                                      :

vs.                            :          OPINION & ORDER

                                    :          [Resolving Doc. 25, 26]

RANDY S. DELANO,        :

LOREAL S. JOHNSON      :

                                    :

             Defendants.     :

                                    :

------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

      In this Opinion and Order, the Court determines the admissibility of tangible evidence and statements obtained after a June 3, 2007 traffic stop.  The United States seeks to offer this evidence against Defendants Randy Delano and Loreal Johnson.  Specifically, the Defendants challenge the initial stop and the seizure of Johnson.  Defendant Johnson also says that subsequent statements that she made should be suppressed as fruits of the poisonous tree. For the reasons stated below, the Court **DENIES** Defendant Delano's motion and **GRANTS** Defendant Johnson's motion.

## I. Background

      The events surrounding the challenged search occurred in the course of a traffic stop.  On June 3, 2007, Deputy George Taylor Cleveland, an Ashtabula County Sheriff's Office deputy sheriff, patrolled in a marked police car on Fortney Road, in Windsor Township, Ohio.  Although Fortney Road is in a very rural and sparsely populated part of Ashtabula County, Deputy Taylor testified it is a hot-spot for drug and illegal activity in Ashtabula County.  While he drove up Fortney

Case No. 1:07-cr-00566
Gwin, J.

Road, he observed a 1987 Chevrolet Camaro preparing to back from the driveway of a house occupied by a known drug dealer, Larry Adams, aka "Navigator J." [Tr. at 13-15].

Traveling toward the Camaro, Deputy Cleveland observed the vehicle stop abruptly as the deputy's car approach.  When he drove by, Deputy Cleveland said that the driver of the car, later identified as Defendant Delano, shielded his face and looked away.  Deputy Cleveland testified that the driver had ample time to pull out of the driveway before he passed, and he surmised the driver was avoiding him. [Tr. at 17-20].

After passing the residence and driveway, Deputy Cleveland slowed down and continued to drive south down the road, keeping an eye on the Camaro in his rear-view mirror.  Approximately three minutes later, when Deputy Cleveland estimated that he was about a mile down Fortney Road, the Camaro exited the driveway and began heading north, in the opposite direction from Deputy Cleveland's vehicle.  Deputy Cleveland turned his car around, and drove approximately 60 miles an hour to catch up to the Camaro.  [Tr. at 18-19, 79].  He was successful in catching up to the Camaro as the Camaro approached the intersection of U.S. Route 322 and Fortney Road. After catching up with the Camaro, Deputy Cleveland drove "a couple of" car lengths behind it. [Tr. at 20].

From this vantage point, Deputy Cleveland testified that he could observe that the driver was not wearing a seatbelt.[1] Deputy Cleveland also testified that although he was two car lengths behind he could see the driver continuously look at his rear view mirror and he improbably testified that he could see the passenger raise her waist up in her seat and "[h]er arms were pushing something down to her middle section and her back was creating a leverage." [Tr. 106].  Acknowledging that a

---

[1]Ohio law does not permit an officer to stop a vehicle for this offense. [Tr. at 109]; O.R.C. § 4513.39.

Case No. 1:07-cr-00566
Gwin, J.

Camaro "sits low to the ground," Deputy Cleveland gave no credible explanation how he could see what a passenger was doing in her waist area. [Tr. 80].

Deputy Cleveland acknowledged that he "didn't believe that [his] observations at that point were substantial enough to make the stop independent of a traffic violation." [Tr. at 102] Therefore, Deputy Cleveland decided to follow the vehicle, check the license plates for warrants, and observe the vehicle to develop probable cause. [Tr. at 104].

After following the Camaro to an intersection, Deputy Cleveland stated that he observed two moving traffic violations: the driver did not stop until well after the stop sign at the intersection of Fortney and OH-322 and the driver initiated his turn signal less than 100 feet before the intersection. [Tr. at 24]. Relative to the distance a vehicle is required to stop with regards to a stop sign, Deputy Cleveland apparently misunderstood Ohio law. Cleveland testified that "in the State of Ohio you also have to stop specifically at the stop sign, and then move past if you need to." [Tr. 23]. Actually, Ohio law does not direct drivers to stop opposite the stop sign but instead requires: "(A) . . . every driver of a vehicle [] approaching a stop sign shall stop at a clearly marked stop line, but if none, [] then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering it." O.R.C. § 4511.43(A).

Deputy Cleveland radioed to his dispatch that he was going to stop the car. [Tr. at 28]. The radio log shows that he radioed his intention to stop the car at 6:47 pm. [Ex. 12].

Deputy Cleveland approached the car, and asked Defendant Delano, the driver, for his license, proof of insurance, and registration. He recognized Defendant Delano from a prior arrest for receiving stolen property–a firearm. As he spoke to Defendant Delano, Cleveland says Delano and the passenger acted nervously, allegedly sweating and tapping their feet. Deputy Cleveland also

Case No. 1:07-cr-00566
Gwin, J.

says that he observed three cell phones in the car, and testified that drug couriers often have more

cell phones than people.

Deputy Cleveland then asked Defendant Delano to come to the back of the Deputy's patrol

car. Deputy Cleveland testified that Defendant Delano was compliant.[2]  After patting Delano down

to insure that he possessed no weapons, Deputy Cleveland placed Defendant Delano into the back

of his patrol car.  Deputy Cleveland's patrol car had no door handles that would have allowed

Delano to exit and he could not leave the back seat area without Cleveland's assistance.  Deputy

Cleveland did not handcuff Defendant Delano and allowed Delano to make calls on his cell phone,

which he did.

At 6:54 pm, Deputy Cleveland radioed in both Defendant Delano's and Defendant Johnson's

social security numbers for a warrant check.  He then called for a K-9 drug dog unit at 7:03 pm.  He

further testified that Defendant Delano became extremely irate upon learning of the call for the drug

dog. [Tr. at 38-40, Ex. 12].

Deputy Cleveland testified that he left Delano locked in the back seat of his patrol car and

went to go talk to the passenger, Defendant Johnson, to ask her for her information so he could write

a ticket.  Later introduced evidence, the Ashtabula County Sheriff Department radio log, proves that

this testimony was untrue–Deputy Cleveland had already received and radioed her social security

number to the Ashtabula Sheriff's Department before approaching Defendant Johnson.  Deputy

Cleveland also testified that he intended to give her the ticket for the seatbelt violation. As indicated,

---

[2]Ralph Childs, a man who lives on Fortney Road, testified he saw a struggle between a white police officer and a white driver at approximately this time on June 3, 2007 on OH-322, a few hundred feet from the intersection of Fortney Road and OH-322.  Childs did not stop his car, but continued driving by the scene.  The Court finds it credible that he believes he saw an officer reach into the car, but also finds that he had only a moment to glance at the scene and may be mistaken.  As whether Deputy Cleveland engaged in physical contact with Defendant Delano at this time is immaterial to this case, the Court will not determine what exactly happened.

Case No. 1:07-cr-00566
Gwin, J.

Deputy Cleveland already knew Defendant Johnson's social security number for purposes of writing

any ticket for a set belt violation.

Deputy Cleveland testified that when he went to talk to her he had safety concerns because

of the movements that he testified he had seen when they were driving. The Court finds this

testimony not credible. It is not believable that from a distance of two car lengths Cleveland could

see through the back of the Camaro seats, seats that are high relative to the roof, to see Johnson

attempting to put something into her pants. [Tr. at 40-44].

Upon approaching Defendant Johnson, Deputy Cleveland testified:

My initial focus when I go up to talk to her specifically on her waistband that's the place where -- that would be the danger area where I saw her moving her hands towards. I looked down and could see the belt was partially undone and her button was flipped down below the belt like somebody would have if they just buttoned it back up below the waistband of the pants right front pocket I could see very large bulge, bigger than two fists together in the front pocket like thigh area of her pants. Her pants were extremely tight, and you wouldn't have been able to hide anything in those pants let alone the size bulge down there, looked like a can of soup down there it was that big and that obvious.

[Tr. at 45]. Defendant Johnson's jeans were extremely tight–a picture of her in them reveals that an

observer can see the outline of her pockets through the tightened denim material. [Ex. 3A].

Deputy Cleveland claimed that he could see a bulge and that he believed the bulge could be

a gun. He asked her if she put something down her pants, but he received no response. Instead, "she

looked straight ahead and didn't say anything to that first question. [] She started to even cry." [Tr.

46].

Deputy Cleveland told Johnson to exit the Camaro. After Defendant Johnson left the vehicle

at Deputy Cleveland's direction, he handcuffed her behind her back. Although he claims that he

handcuffed her out of a concern regarding her dangerousness, he never patted her down for the

Case No. 1:07-cr-00566
Gwin, J.

presence of weapons.  Despite claiming that she had a bulge in a front pocket, he never sought to determine whether the bulge contained a firearm.

After handcuffing Johnson, Deputy Cleveland read her the *Miranda* warnings.  He testified that he was "taking you to jail, and if you are found with any items on you in jail, that's a felony offense?. . ." [Tr. 133].  He told her this although he testified that "I had no basis to arrest her at that point in time." [Tr. 133].  He inconsistently also testified that he would never have taken her to jail without determining what the bulge was, as a safety precaution. [Tr. at 45-50, 133].

He then asked Defendant Johnson whether she had a gun in her pants, to which she answered no.  He asked her if she had drugs and she answered yes.  He asked her how much and she said she thought about two ounces. At this time, he formally placed Defendant Johnson under arrest and placed her in the back of his car. [Tr. at 51-52].

Deputy Cleveland told Defendant Delano what he had found and asked him to step out of the car, handcuffed him, and *Mirandized* him.  Defendant Delano told Cleveland that he did not know anything about the drugs and consented to a search of his car.  Deputy Cleveland took twenty minutes to search the car, but found nothing.  At some point in this time, the radio checks came back and Deputy Cleveland told Defendant Delano he was free to go and transported Defendant Johnson to the police station.  He also called to his supervisor that the drug dog was not needed.  The prosecution presented no evidence as to when he made this call.  The entire stop lasted 55 minutes.

At the police station, Defendant Johnson made certain statements that she challenges as fruit of the poisonous tree.  As they are neither challenged as involuntary or un-warned, the Court will not go into the events surrounding these statements.  Defendant Johnson made further statements the following day.  These are also only challenged as fruit of the poisonous tree.  In December, while

-6-

Case No. 1:07-cr-00566
Gwin, J.

executing an arrest warrant, Special Agent Robert McBride took a statement from Defendant Delano.

This is also only challenged as fruit of the poisonous tree.

## II. Discussion

I. Defendant Delano's Claims

*A. The Initial Stop*

The Fourth Amendment prohibits "unreasonable searches and seizures" by the government.

U.S. CONST. amend. IV.  Temporary detention of persons during a traffic stop is a seizure of persons

and therefore subject to Fourth Amendment's requirement that it not be "unreasonable" under the

circumstances. *Whren v. United States*, 517 U.S. 806, 810 (1996). "As a general matter, the decision

to stop an automobile is reasonable where the police have probable cause to believe that a traffic

violation has occurred. *Id.*  The subjective intent of the officer plays no role in this analysis.  *Id.* at

813.

The prosecution argues that Defendant Delano is collaterally estopped from arguing that he

did not commit the traffic violations or that Deputy Cleveland did not have probable cause to stop

him.  The Court will apply issue preclusion or collateral estoppel in accordance with the Ohio rules.

*See Haring v. Prosise*, 462 U.S. 306, 313 (1983). In Ohio,  "once a court has decided an issue or fact

*necessary to its judgment*, that decision may preclude relitigation of the issue in a suit on a different

cause of action involving a party to the first case." *McKinley v. Mansfield*, 404 F.3d 418, 428 n.9 (6th

Cir. 2005).  To apply issue preclusion, the Court must find four elements: (1) the party against whom

the estoppel is sought was a party or in privity with a party in the original action; (2) there was a final

judgment on the merits after a full and fair opportunity to litigate the issue; (3) the issue must have

been either admitted or tried and decided and must be necessary to the final judgment; and (4) the

Case No. 1:07-cr-00566
Gwin, J.

issue must have been "identical" to the issue involved in the prior suit.  *Prokos v. City of Athens*, 118 Fed. Appx. 921, 926 (6th Cir. 2004).

In this case, Defendant Delano was a party to the traffic ticket judgment, there is a final judgment on the merits of that ticket, the probable cause was decided, was necessary to the judgment, and it is identical to the question here.  As such, the Court finds that Defendant Delano is collaterally estopped from claiming that Deputy Cleveland did not have probable cause to detain him for a traffic violation.

*B. The Placement of Defendant Delano in the Back of the Car*

Nevertheless, "a seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).  When an officer lawfully makes a traffic stop, he or she may ask the driver to step from the car. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977). Officers may make such requests as routine, precautionary measures, regardless of whether they have specific reason to be concerned for their safety. *Brendlin v. California*, 127 S. Ct. 2400, 2407 (2007).  An officer may also lawfully detain a defendant in the back of a squad car while writing citations, checking drivers license information, and running other radio checks, so long as it does not prolong the stop.  *United States v. Wellman*, 185 F.3d 651, 656 (6th Cir. 1999). Therefore, in this case, Deputy Cleveland's placing Defendant Delano in his police car while he ran his and Defendant Johnson's social security numbers and wrote the ticket was permissible.  *See id.*

*C. The Length of the Stop*

"Once the purpose of the initial traffic stop is completed, an officer cannot further detain the

Case No. 1:07-cr-00566
Gwin, J.

vehicle or its occupants unless something happened *during the stop* to cause the officer to have a

'reasonable and articulable suspicion that criminal activity [is] afoot.'" *United States v. Davis*, 430

F.3d 345, 353 (6th Cir. 2005)(emphasis in the original); *see also Terry v. Ohio*, 392 U.S. 1, 30

(1968). Deputy Cleveland testified that he left his car to go speak with Defendant Johnson to get her

information for writing a ticket. Due to the radio log, this is not credible. Deputy Cleveland could

not recall when he received a response from his radio check of the Defendants' social security

numbers. Most likely, he received the identity information nearly immediately.

Defendant Johnson did not have identification with her so Cleveland could ask her further

questions to ensure that she had given him the correct social security number. As such, the

continuation of the stop so that Deputy Cleveland could question Defendant Johnson was likely

within the parameters of the initial traffic stop. The delay was not sufficient to cause Delano's

detention to the back of the patrol car become unreasonable.

### D. The Evidence obtained from Defendant Johnson's Person

Defendant Delano also challenges the search of Defendant Johnson. The Court, however,

finds that he does not have standing to make this challenge. "'[C]apacity to claim the protection of

the Fourth Amendment depends . . . upon whether the person who claims the protection of the

Amendment has a legitimate expectation of privacy in the invaded place.'" *Minnesota v. Olson*, 495

U.S. 91, 95 (1990) (citation omitted). A subjective expectation of privacy is legitimate if society

deems the expectation reasonable. *See id.* at 95-96.

Defendant Delano did not have a legitimate expectation of privacy in Defendant Johnson's

pockets or pants. *See United States v. Hunter*, 550 F.2d 1066, 1074 (6th Cir. 1977) (finding a

defendant had no legitimate expectation of privacy in a co-defendant's girdle); *see also United States*

-9-

Case No. 1:07-cr-00566
Gwin, J.

*v. Carter*, 14 F.3d 1150, 1155 (6th Cir. 1994)(noting that the exclusionary rule only excludes

illegally seized evidence as to the victim of the search).

*E. The Statements*

1. Defendant Johnson's statements

Defendant Delano further challenges the admissibility of Defendant Johnson's statements as

fruits of the poisonous tree. The Court has found that he has no standing to challenge the search that

led to these statements. Thus, he cannot challenge the statements as fruits. *See United States v.*

*Williams*, 354 F.3d 497, 510 (6th Cir. 2003 )("This Court has twice held that *Wong Sun* precludes

the argument that a defendant is entitled to the suppression of evidence simply because it is the fruit

of a violation of his co-defendant's Fourth Amendment rights.").

2. Defendant Delano's Statements

Finally, the Court does not find that Defendant Delano's December statements were fruits

of a poisonous tree. The Court has found no violation of Defendant Delano's Fourth Amendment

rights. Defendant Delano cannot challenge his statement as a fruit of a violation of Defendant

Johnson's rights. *See id.*

For these reasons, the Court denies the motion to suppress as to Defendant Delano.

II. Defendant Johnson

*A. The Initial Stop*

In subsection I.A, with regard to Delano's argument that the traffic stop was not supported

by probable cause, the Court found that the initial stop was permissible as a stop for a traffic

violation. *Whren*, 517 U.S. at 810. This Court reasoned that Delano was estopped by his conviction

Case No. 1:07-cr-00566
Gwin, J.

from challenging Deputy Cleveland's probable cause to stop him.  In contrast to Delano, Defendant

Johnson is not estopped from arguing that Defendant Delano did not violate the traffic laws, as she

was neither a party nor in privity with a party in the state court action.  *See Prokos*, 118 Fed. Appx.

at 926 (for collateral estoppel to apply, the party to be estopped must have been a party to or in

privity with a party to the other action).  The Court, however, finds it unnecessary to consider the

argument that no probable cause supported Cleveland's stop of Delano.  For the reasons set out

below, the Court finds that Deputy Cleveland arrested Johnson without probable cause and, as a

result, any admissions she made during that arrest should be suppressed.

*No Reasonable Suspicion that Defendant Johnson was Armed and Dangerous*

As he approached Defendant Johnson in the car, Deputy Cleveland testified that he saw a

bulge in her front pocket that he feared could be a gun.  The Court finds Deputy Cleveland's

testimony not credible.  Johnson was seated in the passenger seat, Cleveland approached the Camaro

from the passenger side.  Johnson offered evidence that she wore a large jacket that reached to her

mid-thigh area.  It is nowhere clear that Cleveland could see Johnson's waist area as she sat in the

Camaro.  Moreover, the packages of drugs that Deputy Cleveland ultimately retrieved from her

pocket could not plausibly be confused with a firearm, especially when crammed into a tight pants

pocket.

As described, Cleveland testified that he could observe a bulge in Johnson's waist area.

Deputy Cleveland's testimony about the size of the bulge and his ability to observe it is incredible.

He testified that the packages was the size of a can of soup.  Pictures of the packages retrieved from

Johnson's pocket betrays this description and the packages look nothing like a firearm.

The Court finds many other reasons to find Deputy Cleveland's testimony questionable.

Case No. 1:07-cr-00566
Gwin, J.

First, Deputy Cleveland testified that while driving two car lengths behind Defendant Delano's car he could see Defendant Johnson putting something in her pants.  That Deputy Cleveland could ascertain anything of the kind from a motion of Defendant Johnson's shoulders is not believable.  Second, Deputy Cleveland testified that after leaving Delano locked in the patrol car, he approached Defendant Johnson to get her social security number to issue her a ticket.  This was false, as later proved by the government's own radio log.  He testified that he did not tell Defendant Johnson that she was going to jail, but that he discussed with her what would happen if he were to take her to jail–as if it had been an abstract discussion.  In contrast to this testimony, Cleveland later testified that he had told Johnson that he was taking her to jail.  Also, he had written in his report: " I informed Johnson that it  was obvious that she was concealing something in her  waistband and that I would be taking her into the jail for a female officer to remove the item."

Under *Terry*, a police officer who makes an investigatory detention may conduct a limited pat-down frisk of a suspect's outer clothing. *Terry*, 392 U.S. at 27, 30.  The law enforcement officer must limit the frisk in scope to a  search for weapons and may not be used to search for evidence of criminal activity. *Id.* at 29-30; *Minn. v. Dickerson,* 508 U.S. 366 (1993); *see also United States v. Miles,* 247 F.3d 1009, 1014-15 (9th Cir. 2001) (a manipulation of clothing to learn its contents exceeded scope of *Terry* because it was clear that the clothing did not contain a weapon.)

Deputy Cleveland testified that he was unwilling to frisk Defendant Johnson because he did not have another officer to witness it, and he felt it would be imprudent to frisk a woman in the crotch region.  Johnson's pocket was not in her crotch area.  Moreover, *Terry* gives an investigating officer a right to pat a suspect down to protect the officer, not to allow an investigation.

During a *Terry* stop, police must follow a line of investigation that would confirm or dispel

-12-

Case No. 1:07-cr-00566
Gwin, J.

their suspicions quickly. *See United States v. Sharpe*, 470 U.S. 675, 687 (1985). A frisk of the Defendant would have also quickly revealed that she was not carrying a gun. The Court further doubts that any frisk would have definitively confirmed Deputy Cleveland's suspicion that she was carrying drugs. It seems much more believable that Deputy Cleveland only suspected drugs, and he knew that any frisk would reveal that it was not a gun.

Finally, the Court finds it not credible that if Deputy Cleveland initially suspected the bulge was a gun, he would have allowed the Defendant to remove it from her pocket herself. While Deputy Cleveland only allowed her to remove the bulge from her pocket after she had admitted it was drugs, if he had been truly concerned that it may have been a firearm, the Court doubts that he would have allowed her to complete this action.

For these reasons, the Court finds that Deputy Cleveland could have conducted a frisk but apparently believing such a frisk was not needed, he did not have right to unreasonably detain her.

*2. Arrest*

The Court finds that Deputy Cleveland's asking her to get out of the car, placing her in handcuffs, reading her the *Miranda* warnings, and informing her he would be taking her to the police station, was a *de facto* arrest. A seizure occurs if, "in view of all of the circumstances surrounding the incident," the person reasonably believes she is not "free to leave." *See Michigan v. Chesternut*, 486 U.S. 567, 573 (1988). Here, any reasonable person in Johnson's position would believe she was not free to leave and was under arrest. Any decision regarding whether a defendant is in custody for Fourth Amendment purposes "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 320 (1994) (per curiam); *see also Berkemer v. McCarty*, 468

Case No. 1:07-cr-00566
Gwin, J.

U.S. 420, 442 (1984) ("[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.").

The Sixth Circuit has listed a number of factors that a court must consider in determining whether a person is arrested. These include the transportation of the detainee to another location, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, the use of weapons or bodily force, and the issuance of *Miranda* warnings. *See United States v. Shaw*, 464 F.3d 615, 621 (6th Cir. 2006); *United States v. Williams*, 170 Fed. Appx. 399, 403 (6th Cir. 2006).

Deputy Cleveland ordered Defendant Johnson out the car, placed her hands in handcuffs behind her back, *Mirandized* her, and told her that he would be taking her to jail. While the prosecution cites cases that state that Deputy Cleveland could handcuff Defendant Johnson since he feared for his safety. The Court has already found that his testimony that he was afraid that Defendant Johnson had a gun is not credible. Moreover, while the use of handcuffs alone do not transform a detention into an arrest, *Houston v. Does*, 174 F.3d 809, 815 (6th Cir. 199), it is a factor in the analysis. *Williams*, 170 Fed. Appx. at 403.

Deputy Cleveland told Defendant Johnson that he was taking her to jail so that a female police officer could remove the item from her pocket. While his testimony on this point was equivocal, he stated in his police report that he told her "I would be taking her into the Jail for a female officer to remove the item." Deputy Cleveland testified that he told her "exactly that which [he] said in his report." [Tr. at 135]. Deputy Cleveland's statements would lead a reasonable person to believe that transportation was imminent. The handcuffs and *Miranda* warnings are further evidence an arrest. *See Williams,* 170 Fed. Appx. at 403.

-14-

Case No. 1:07-cr-00566
Gwin, J.

In *Williams*, the Sixth Circuit found a detention became an arrest where the officers forced him to exit his car, patted him down, handcuffed him and placed him in the back of the police car, read him his *Miranda* warnings, and interrogated him.  170 Fed. Appx. at 403.  Similar to here, the officers did not actually transport the defendant anywhere.  By contrast, in this case, an objectively reasonable person would have believed that transportation to another location was imminent.  *Shaw*, 464 F.3d at 622 (holding courts must consider the objective circumstances of the detention not the subjective belief of the individual).  This, in addition to being ordered to exit a car, handcuffed, read *Miranda* rights, and interrogated would surely make an objective person believe he or she was under arrest.  *See Williams*, 107 Fed. Appx. at 403.

*3. No Probable Cause*

Having found that Deputy Cleveland arrested Defendant Johnson, the Court considers whether Deputy Cleveland had probable cause to make this arrest.  A warrant-less arrest passes muster under the Fourth Amendment when there is probable cause to believe a criminal offense has been or is being committed.  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).

Whether probable cause exists "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."  *Id.*  "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized."  *Id.* The Court must determine "whether the officer's action was justified at its inception," and "whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000) (citing *Terry v. Ohio*, 392 U.S. 1, 19-20

-15-

Case No. 1:07-cr-00566
Gwin, J.

(1968)).  Generally, any items seized or statements taken incident to an unlawful arrest will be suppressed as fruit of the poisonous tree.  *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

At the time of the arrest, Deputy Cleveland knew that Defendant Johnson was a passenger in a car leaving a known drug-dealer's house, that the car had stopped abruptly to allow the deputy to pass, that the car had three cell phones but only two people in it, that Defendant Johnson had not been wearing her seatbelt, and that she was wearing tight jeans and something–clearly not a gun–but something was in her pockets.  Deputy Cleveland also knew that the driver had just come from Warren, Ohio, a known source for drugs in Ashtabula County, and he knew the driver had become very upset upon learning a drug dog was coming to sniff his car.  These last two facts, however, are not particularized to Defendant Johnson, but are facts relevant to Defendant Delano.  Based on the above, Deputy Cleveland did not have probable cause to effectuate an arrest.  Deputy Cleveland confirms this finding, testifying that he did not believe that he had cause to arrest her, as he testified that "I had no basis to arrest her at that point in time." [Tr. at 133].  At best, Cleveland had probable cause to cite Johnson for a seat belt violation.

The prosecution argues that the arrest was based on probable cause for the seatbelt violation, Ohio law not withstanding.  It cites *Atwater v. City of Lagos*, a Supreme Court case that expressly rested its holding on the fact that Texas law allowed a Texas police office to arrest for a traffic violation.  532 U.S. 318, 341 (2003).  By contrast, Ohio law does not allow a police officer to either stop a vehicle or make an arrest for this offense.  O.R.C. § 4513.39.  As such, the seatbelt violation could not constitute probable cause for arrest.

The United States makes a belated argument that the drugs found on Johnson would have been inevitably discovered.  The argument is untimely, is unsupported by the evidence and does not

Case No. 1:07-cr-00566
Gwin, J.

persuade.  First, the argument is untimely.  The United States failed to even mention this argument at hearing and offered no direct evidence to support the argument.  Second, the evidence does not support the argument.  The United States argues that Cleveland could have patted Johnson down and, if he had, would have realized that the package in her pocket was drugs.  But this misses the point. Absent probable cause for an arrest, *Terry* allows the pat-down, but only to look for weapons.  If drugs are found during a pat-down for weapons, the inadvertently found evidence becomes permitted.  But the purpose of the pat-down remains ensuring the safety of the officer by allowing the check for weapons.  The right to pat-down is not independent.

For whatever reason, Deputy Cleveland never patted down Johnson for guns, likely because it was obvious that Johnson had no firearm in the tight jean pocket.  Having confused the *Terry* right to pat-down for weapons with some right to pat-down for drugs, the United States does not persuade that discovery was inevitable.

Alternatively, the United States argues that Cleveland had called for a canine able to sniff for drugs and this dog, when it arrived, would have inevitably discovered that Johnson had cocaine in her pocket.  In *Illinois v. Caballes*, 543 U.S. 405, 407-08 (2005), the Court allowed a trained dog to sniff for drugs about a stopped automobile but emphasized that the use of the dog did not extend the delay associated with the traffic stop: "In an earlier case involving a dog sniff that occurred during an unreasonably prolonged traffic stop, the Illinois Supreme Court held that use of the dog and the subsequent discovery of contraband were the product of an unconstitutional seizure. *We may assume that a similar result would be warranted in this case if the dog sniff had been conducted while respondent was being unlawfully detained.*"  *Id.*(citation omitted) (emphasis added).

Here, Cleveland initiated the stop at 6:47 pm.  He testified that traffic stops typically last 12 -

-17-

Case No. 1:07-cr-00566
Gwin, J.

24 minutes.  Yet he first called for a K-9 unit at 7:03 pm.  Deputy Cleveland then arrested Johnson

near 7:35 pm.  Nothing suggests that the K-9 unit would have arrived and conducted a test during

the time period normally associated with traffic stops.  Under *Caballes*, detaining Johnson to await

the arrival of the K-9 unit would have been unlawful.

As to this argument, Cleveland never patted her down.  the inevitable discovery rule applies

if the evidence would inevitably have been discovered through independent, lawful means.  The

United States did not specifically argue inevitable discovery and offered scant evidence on that issue.

The Court will not address the prosecution's belated inevitable discovery argument.  The prosecution

makes this argument in its supplemental brief, ordered by the Court for citations on the *res judicata*

and collateral estoppel arguments made regarding the initial stop.  Any additional and new

arguments are not permissible.  For one thing, the Defendants have no way to respond to these new

arguments.  Moreover, the prosecution did not elicit the necessary testimony to resolve the question

in the suppression hearing, nor did the defense have the opportunity to cross-examine Deputy

Cleveland on that question.  Deputy Cleveland testified that in general he can recognize certain

containers that frequently contain drugs during a pat down.  The Court heard no testimony specific

to this incident.

*3. Fruits of the Poisonous Tree*

For the above reasons, the Court finds that Deputy Cleveland arrested Defendant Johnson

without probable cause.  Immediately after this illegal arrest, Deputy Cleveland questioned

Defendant Johnson and obtained a confession that she had two ounces of cocaine in her pocket.

Defendant Johnson's answers to Deputy Cleveland's questions after her arrest, the evidence taken

from her at the scene, and the statements she made after being transported to the station and the

-18-

Case No. 1:07-cr-00566
Gwin, J.

following day are all fruits of the poisonous tree–the unlawful arrest.  *See Wong Sun*, 371 U.S. at

487-88.  The Supreme Court long-ago espoused this "exclusionary rule," *see, e.g., Silverthorne*

*Lumber Co. v. United States*, 251 U.S. 385 (1919), and has since stated the rule's scope:

> The Government cannot violate the Fourth Amendment . . . and use the fruits of such
> unlawful conduct to secure a conviction. Nor can the Government make indirect use
> of such evidence for its case, or support a conviction on evidence obtained through
> leads from the unlawfully obtained evidence. All of these methods are outlawed, and
> convictions obtained by means of them are invalidated, because they encourage the
> kind of society that is obnoxious to free men.

*Walder v. United States*, 347 U.S. 62, 64-65 (1954) (Frankfurter, J.).

When determining what evidence should be excluded under the fruits doctrine, the Court asks

"whether, granting establishment of the primary illegality, the evidence to which an objection is

made has been come at by exploitation of that illegality or instead by means sufficiently

distinguishable to be purged of the primary taint." *Id.*  The Court considers factors such as the length

of time between the illegal seizure and the consent, the presence of intervening circumstances, the

purpose and flagrancy of the official misconduct, and whether the officers read the suspect his

Miranda rights before he consented.  *See United States v. Lopez-Arias*, 344 F.3d 623, 630 (6th Cir.

2003). The United States has the burden of proving the admissibility of a confession following an

illegal arrest or search. *Kaupp v. Texas*, 538 U.S. 626, 633 (2003).

The voluntariness test requires that consent qualify as voluntary under the Fifth Amendment,

i.e., not result from coercion. *Brown*, 422 U.S. at 601-02.  Courts must apply both the voluntariness

and causal connection tests when determining the admissibility of tainted evidence. *Id.* at 603-04.

In this case, Defendant Johnson does not make an argument that the statements were

involuntary under the Fifth Amendment.  Moreover, Defendant Johnson made the statements after

she received the *Miranda* warnings. Thus, the Court finds the threshold Fifth Amendment question

Case No. 1:07-cr-00566
Gwin, J.

is not at issue, and continues to the Fourth Amendment concerns.  *See id.* at 601 ("*Miranda*

warnings, and the exclusion of a confession made without them, do not alone sufficiently deter a

Fourth Amendment violation.")

    The statements that Johnson made at the scene of the crime exploited the illegal arrest.

Before her arrest, she not respond to his questions.  It was only after he had ordered her out of the

car, handcuffed her, read her the *Miranda* warnings, told her that he would be taking her to jail, and

that she would be charged with a separate felony if the female officer who searched her at jail found

any contraband, that Defendant Johnson admitted that drugs were in her pocket. In *Lopez-Arias*,

thirty minutes was not sufficient to break the chain of causation between the illegal arrest and a

consent to search, even though the defendant had been read the *Miranda* warnings.  *Id.*  Similarly

here, there were no intervening circumstances. [Tr. at 53]  These statements are not admissible under

the fruits doctrine. *See id.*

    Moreover, any statement made at the station directly after the arrest also came at the

exploitation of the initial unlawful arrest.  At most, she made this statement ~~at most~~ an hour after she

had arrived at the jail.  [Tr. at 66] In *Brown v. Illinois*, the Supreme Court found that two hours was

insufficient where there were no intervening circumstances[3] and that *Miranda* warnings alone were

insufficient to purge the taint of illegality.  422 U.S. 590, 604 (1975).  The Court finds the facts

surrounding Defendant Johnson's statement after her arrest and booking analogous to those in

*Brown*.  As such, the statement she made after she was booked is excluded under the fruits doctrine.

*See id.*

---

    [3] "[T]he types of intervening events that serve to attenuate police misconduct are those that sever the causal connection between the illegal arrest or search and the discovery of incriminating evidence." *See United States v. Baldwin*, 114 Fed. Appx. 675, 684 (6th Cir.  2004).  The Court notes the transportation of her to jail does not sever the causal connection between the illegal arrest and her confession.

Case No. 1:07-cr-00566
Gwin, J.

Defendant Johnson made a second statement the next day.  The Court finds this statement was also based on an exploitation of the illegal arrest.  As an initial matter, after she made the first statement, Deputy Cleveland stated to her that he believed she possessed knowledge about this and other criminal cases and that while he was not a prosecutor and could not make any deals, he could put her in contact with those people.  At that point, Defendant Johnson indicated she would speak with him again.  Based on this, the Court finds that Defendant Johnson's second statement flowed from Deputy Cleveland's statements.  Only 24 hours had elapsed between her ~~illegal~~ arrest and her second statement, and the prosecution has failed to point to any intervening circumstances.  *See United States v. Baldwin*, 114 Fed. Appx. 675, 684 (6th Cir. 2004)(excluding a confession that occurred two months after the initial illegal arrest where there were no relevant intervening circumstances).

Finally, the United States has not put forth any argument that these statements are not suppressible as fruits of the poisonous tree except that Defendant Johnson received her *Miranda* warnings.  As the Supreme Court said in *Brown*, this, alone, is insufficient to purge the taint from the initial illegal arrest.  422 U.S. at 604.

### III. Conclusion

For the above stated reasons, the Court **DENIES** Defendant Delano's motion to suppress and **GRANTS** Defendant Johnson's motion to suppress.

IT IS SO ORDERED.

Dated: February 26, 2008                               s/            *James S. Gwin*
                                                                        JAMES S. GWIN
                                                                        UNITED STATES DISTRICT JUDGE